866

Angelo SANTAMARIA, Libelant,

v.

THE SS OTHEM, Fearnley & Egger, Inc.,
R. Myrsten & Rederi, A/B/Volo,
Respondents.

No. 20391.

United States District Court
E. D. New York.
March 4, 1959.

DiCostanzo & Klonsky, Brooklyn, for libelant, by Robert Klonsky, Brooklyn, of counsel.

Haight, Gardner, Poor & Havens, New York City, for respondent, by William P. Kain, New York City, of counsel.

BYERS, Chief Judge.

The libelant (stevedore) seeks a decree against the Steamship Othem because of her alleged unseaworthiness on May 4, 1954; he fell on the deck of the ship during the course of his employment and suffered injuries.

By consent, all parties named in the libel have been dismissed from the cause, save the ship and her owner.

The libelant was a gangwayman standing alongside hatch No. 4, which was 19 feet wide and 29 feet fore and aft, just prior to his accident, and fixes the time of the latter at around 9:30 a. m.

As will be seen, the actual time is an important element of the controversy.

The ship lay starboard side to the State Pier, Columbia Street, Brooklyn, having arrived on May 1st, which was a Saturday. Discharge began on the 3rd and proceeded without incident on that day from the No. 3 hatch and somewhat from the aft part of No. 4. The hatch was closed when the men knocked off at 5:00 p. m.

On May 4th at about 8:05 a. m. those hatchboards were removed and during the ensuing ten or fifteen minutes cargo was cleared from the aft portion of the hatch, and changes in the rigging of the ship's cargo tackle were needed in connection with the discharge from the forward end.

The equipment involved consisted of two sampson posts and booms connected thereto at the top.

As the ship lay in her berth, the up and down boom was on the port side, and the Burton to starboard; it was necessary to lower the former so that its tip and the depending fall to which drafts were made fast in the lower hold, would be over the place where the cargo handlers were working. The lowering of the boom occupied about ten or fifteen minutes. Seemingly the Burton boom to the starboard, which was in position over the stringpiece of the pier on which the drafts were landed, was not shifted; however there is no testimony on this subject.

The rigging of the tackle used in the operation is not the subject of dispute and as presently understood, it involved one fall operated by the up and down

winch, whereby a draft was hoisted three or four feet above the hatch coaming; at that level a lateral force was exerted by the fall connected with the Burton boom when the latter took over the task of swinging the draft over to and landing it upon the pier.

If this is correct, the two falls operated as one, but in sequence. Thus the respondent's brief states:

"The cargo wires or falls were married together and shackled into a single cargo hook."

This is thought to mean that when the Burton fall began to function, the up and down fall payed out, so that the draft could be landed on the pier.

Perhaps that detail is unimportant, and it is reasonable to infer that counsel were of that opinion or they would have presented the picture in greater detail.

Since the up and down boom had to maintain a fixed position, two stays or guys were rigged from its head so as to hold it, namely a preventer (steel cable) and working (manila).

As to the former there is no dispute that it led to the offshore or port side of the ship, and was made fast to cleats or padeyes in the deck; as to the working guy, the same is said to be true. For instance, the respondent's brief states:

"The witnesses were also in agreement that the working and preventer guys for the port (up and down) boom led from the head of the boom to the port (offshore) side of the ship and were secured to cleats and padeyes on the deck and rail."

The witness Stalnabb, who was the second mate of the ship at this time, testified to still another, called a lazy guy, thus:

"Q. Now, this lazy guy, is that a guy that runs from the port boom over to the starboard rail? A. Yes.

"Q. Its purpose also is to give security; is that right? A. Yes.

"Q. Was that within the design of the boom when you first got it? A. Yes.

"Q. The lazy guy is within the design of the boom? A. Yes.

"Q. But the preventer guy is not, is that what you say? A. No." (probably he meant Yes).

The importance of the subject of whether there were two or three of such guys or stays lies in the contention of the libelant that both the preventer and working guys carried away, which caused a draft which was being raised at the time to swing to the starboard side of the ship where he was working. That assertion is corroborated by at least one of the libelant's witnesses.

On the other hand, the meager records indicate that only the preventer broke and that the working guy continued to function. The positive evidence concerning repairs to, or replacement of the preventer, results in the finding hereby made that it was was only the preventer which carried away.

In performing his duties as gangwayman, it was the libelant's job to signal to the winchmen operating both booms, when a given draft had reached the desired level so that the Burton winch would take over its function; and thereafter to inform that winchman how far to lower the draft for delivery on the pier; to do this he stood in a position toward the forward end of the hatch with his left side to the rail, facing the winchmen, and in the regular course of events a draft would swing in front of him while he was in a position to watch it as it was handled by the Burton winch as above stated.

That is the position which he is found to have occupied just prior to the incident giving rise to his claim against the ship.

It is at this juncture that the element of time becomes important. It is the testimony of the libelant and his witness Scala, the up and down winchman, that the libelant was injured between 9:00 and 9:30 o'clock, while the respondent's evidence indicates that the breaking of the preventer occurred at about 8:30, namely the records of the libelant's em-

ployer, Pittston, that there was a detention on this day at No. 4 hatch from 8:30 to 9:00 a. m. because of a broken preventer guy line. (The ship had to pay for this time.)

The respondent offered the accident report made by McCarthy, the Pittston timekeeper, which recites that the first knowledge of injury was at 9:10 a. m. Incidentally, that statement by way of description contains the following:

"While walking on deck of ship he slipped and fell. (Deck of ship wet.) Rain."

That statement was signed by Susino, who was the hatch boss but was not called as a witness. McCarthy testified that libelant provided to him the information contained in the report, which also states that medical aid was provided at 9:30 a. m.

While it is true that the detention period was probably stated with reasonable accuracy in the interest of Pittston, and the repairs to the preventer may be deemed to have been completed by 9:00 o'clock, the time of the libelant's injury is close enough to that, to convince this court that the case cannot be disposed of on the theory that the breaking of the preventer and the libelant's fall were unrelated things.

Since that breaking of the preventer is an undisputed fact, it becomes necessary to determine whether it was the cause of the libelant's fall.

In this connection the allegations of the libel (filed June 15, 1955) should be consulted. In Article Fifteenth it is alleged that through the negligence, etc. of the respondent "and by reason of the unseaworthy condition of the vessel" libelant was

"struck by the draft when the guys parted and fell to the deck and upon rising, he slipped upon the deck that was being swabbed by the members of the crew, as a result of all of which he sustained serious etc. injuries."

The ascription of unseaworthiness is found in Article Seventeenth and avers that the respondent

"failed and neglected to keep the aforesaid vessel, particularly the guys and decks thereat in a safe and seaworthy condition; in failing to provide the libelant with a reasonably safe place in which to work; in failing and neglecting to make due, timely and proper inspection of the tackle, decks, guys, appliances and equipment then and there being used by the libelant and his co-workers in the performance of the work at hand, and in failing to employ experienced and skilled employees."

It appears that the libelant first applied for compensation under the Longshoremen's etc. Act, under which some payments were made. Thereafter this cause was instituted.

It will be seen that the libelant's task undertaken in this litigation was to establish that the breaking of the preventer was the cause of injury to him, for not otherwise could the ship be deemed unseaworthy in that respect. That means that he undertook to prove the direct relationship between the breaking of the preventer and his injury.

The report of accident above referred to is the nearest contemporaneous record of what the libelant asserted as the basis for his claim, which was that he fell upon a wet deck.

As above stated, this court believes that he did fall, not on the starboard side where he was stationed, but on the port or off-shore side of the vessel. There would have to be a reason for his crossing the deck, as I believe he did, and if the preventer had already broken it would be natural for him to seek a close view of the then parted guy.

This it is found he did, and fell upon a bitt on the port side of the ship.

That fall would not be sufficient in itself to sustain the issue of unseaworthiness, and so the theory was evolved that causal relationship could be established

if the breaking of the preventer caused him to be struck by the draft which was in the course of being landed at the time that the preventer carried away.

He asserts that he was so struck by the draft which swung sufficiently forward from its expectable course, to cause him to fall on the deck; the witness Scala, operating the up and down winch, testified that he saw this happen; the witness Nespoli testified to the same effect on his direct, but on cross-examination admitted that he did not see the alleged striking, and this must be so because he was not in a position to see what actually took place.

Scala said in effect that the draft fell to the deck although why it should have was not demonstrated, and it is argued for the libelant that what probably happened was that one or more of the bags constituting this draft (ten or a dozen in number) fell out of the rope sling which held the bags together.

The respondent's testimony consisted in the opinion of an expert who was well accredited, that the parting of the preventer would not result in the swinging of the draft far enough forward—having in mind the libelant's conceded position—to have struck him at all. Moreover, the working guy is not shown to have carried away.

Since the libelant's first assertion of the cause of his injury as above quoted did not mention the striking, it is the view of this court that his testimony at the trial and that of Scala is not sufficiently convincing to hold that he has sustained his burden of proof in this connection.

The testimony as a whole on this subject, considered with the court's understanding of the mechanical aspect of the entire situation, indicates in my opinion that as to the asserted striking of the libelant by the draft, or any of its components, the wish has been the father to the thought.

It is therefore found that no such striking occurred, and that the libelant's movement across the deck was unrelated to any such asserted episode.

His claim therefore must rest upon the cause of his fall on the port side of the ship, and in this branch of the case the testimony at most establishes that the deck in the immediate vicinity of the bitt upon which the libelant fell, was wet.

It was sought to be established at the trial that the deck was slippery because of the presence of soapy water which was accounted for by the alleged activity of the members of the crew on the morning in question.

An understanding of this subject requires a statement that above the main deck of the vessel there was an upper deck for the use of the few passengers that a freight ship could carry.

That deck occupied the midships section of the ship between hatches Nos. 3 and 4; its after end on the port and starboard sides was about flush with the forward end of No. 4 hatch, but in the section between the port and starboard wings of the deck, so to speak, the after end of that deck was constructed sufficiently forward to admit of a four or five foot passageway on the main deck between the respective sides thereof, as will be seen by an examination of Libelant's Exhibit 1, a plan of the ship. That upper deck carried lifeboats, and in order to account for the presence of water on the main deck in the vicinity of the bitt upon which the libelant fell, various explanations were offered in the libelant's case, namely:

That some members of the crew were observed by one or more of the libelant's witnesses to have been engaged between 8:00 and 8:30 in the morning in scrubbing the canvas covers of the lifeboats with soap, with the result that the water so formed found its way to the upper deck and thence aft and fell upon the main deck.

The testimony of the mate dispelled any possible question on this subject, in the mind of the court.

It is found in this connection that no soap was used by members of the crew on the lifeboat covers or otherwise, on

the upper deck on the morning of May 4, 1954.

As an alternative theory, it was then stated that anyhow the members of the crew were engaged in washing down the upper deck, causing water to accumulate thereon and to fall to the main deck.

This court is persuaded by the mate's testimony, that there was no washing down on that deck by the members of the crew on the morning in question, the reason being that there was no occasion for any such activity; nor do I think that Scala, whose preoccupation was in the operation of the up and down winch, was a convincing witness as to what he said he observed on the part of the crew beginning at 8:00 o'clock or thereabouts of that morning.

It is argued that because of the washing of the deck, water accumulated at the after end of the deck and instead of being carried off by the scuppers provided for that purpose, it either splashed down the stairway connecting the upper deck with the main deck, or else the scuppers failed to function with the result that there was an accumulation of water on the upper deck sufficient to override its two inch coaming, thus creating a slippery condition on the main deck, which caused libelant to fall upon the bitt.

It is found that no such condition was created as is argued for the libelant, on the upper deck, and that his fall did not result from an accumulation of water on the upper deck which found its way to the main deck.

The remaining contention for the presence of water is that which is consistent with the libelant's claim as made to the timekeeper as above quoted, namely, rain resulting from showers which prevailed during the night of May 3rd or during the morning of May 4th, prior to the accident.

■ Obviously the ship was not unseaworthy because of the fall of rain, and unless and until it is held by controlling decision or by legislation that a ship insures that a stevedore working upon it shall not suffer any injury whatever while in the course of his employment, it cannot be held that that ship has been shown to be unseaworthy because the main deck was wet as the result of the falling of rain. Cf.: Ross v. Zeeland, 4 Cir., 240 F.2d 820, at page 822; Daniels v. Pacific-Atlantic S. S. Co., D.C., 120 F. Supp. 96, and cases cited on page 99; Ruffin v. U. S. Lines Co., Sup., 148 N.Y.S. 2d 112.

It was to take care of inevitable injuries which reasonable precaution could not prevent, that the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq. came into being, and it is not the present understanding that the obligation of a ship toward a stevedore is that of absolute duty to make compensation under any and all circumstances.

The upshot of the case is that in the opinion of this court, the libelant has not demonstrated by convincing evidence that this ship was unseaworthy, or that it was negligent in the respects involved in this accident.

This view renders it unnecessary to discuss the extended medical testimony which is thought to demonstrate that he suffered a shoulder injury when he fell against the rail on the port side of the ship; that was temporarily disabling and may perhaps have caused some degree of muscle atrophy, but not sufficient to prevent him from resuming his employment as gangwayman, which he did some seven months after his fall.

Moreover that the fall upon the bitt caused him to suffer a hernia on the right side and to excite a latent similar condition on the left side, both of which were corrected by operative procedure.

Decree for respondent; to be settled.